NETTIE HYMAN, Plaintiff-Respondent, v. THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, a Corporation, Defendant-Appellant, and HARRY J. NEUBAUER, Defendant, No. 41355—225 S. W. (2d) 734.

Division Two, December 12, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, January 9, 1950.

*Jones, Hocker, Gladney & Grand, Lon Hocker, Jr.,* and *Vincent L. Boisaubin* for appellant.

*Frank C. Boland, Everett Hullverson* and *Forrest Boecker* for respondent.

ELLISON, J.—This is an action for personal injuries sustained by the plaintiff-respondent from slipping and falling on the vestibule entrance tile floor to the store of the defendant-appellant corporation in St. Louis. The jury awarded her $10,000 damages against the corporation, but found in favor of the manager of the store, who was joined as a defendant. The respondent's case was based considerably on the testimony of Warren Jones, an architect, who testified as an expert concerning the construction and condition of the vestibule entrance floor. The appellant's contentions on this appeal are: (1) that Jones' testimony was inadmissible because he was not an expert, and that at best it was based on surmise and speculation, and facts not shown to have existed at the time of the casualty; (2) that respondent's instruction 2 purporting to cover the whole case was erroneous because it omitted necessary elements; (3) and that the $10,000 damages awarded were excessive.

The outline facts were that the respondent (70 years old) and her husband entered the vestibule a little before noon on April 20, 1946, to buy groceries at the store. She testified that when about 2-½ feet from the door "I felt something under my shoe, and I lost control and fell." She was walking slowly, fell on her left side, and felt her leg snap. She observed a small piece of loose tile lying on the vestibule floor about six inches from a clean spot and told her husband "It was that that threw me." This clean spot was about the same size as the loose tile, and was where a tile was missing. [The court excluded as a conclusion her statement that *the* loose tile she saw had come from that spot.] The assistant manager of the store at the time testified she told him "she stepped on something."

Respondent's husband (72 years old) testified that on entering the vestibule he preceded her to open the store door. She was facing the door and he saw her fall. At that time the witness made no examination of the vestibule but did notice a piece of tile was

broken out "for" (from?) one place. It was lying there about six inches from where his wife fell. She pointed to it and said "Here is the piece that throwed me." In size it was a little less than an inch, and of the same color as the other tile. There was a place where a piece of tile was missing. It was clean, and was the only place where it appeared the loose tile would fit. Both were the same shape, and the place where he thought it had come out was , clean. About a week later the witness made an examination and found five or six places where title were out at the edge of the vestibule. These places were dark and dirty. Photographs offered in evidence indicate there were such places along the junction line of the vestibule floor and the public sidewalk.

Respondent's expert witness, Warren Jones, was an architect and supervising architect of 25 years experience, but not a graduate of any professional school. He had studied for five years under his grandfather, an architect. His duties as supervising architect, required him to be familiar with construction methods and materials [rather than designs and plans]. He had had continuous experience during the 25 years with tile construction work and materials in both residences and stores, and it was his duty to determine the methods to be used. He said his experience had enabled him to form an expert opinion on the causes of disintegration of such work, including the loosening of tile and their becoming detached; and that from his training and experience he could form an opinion as to how long those conditions had existed prior to the time of examination.

Having thus qualified as an expert, the witness testified he examined the vestibule of appellant's store on March 30, 1947, about 11 months after the casualty. The tile used was ceramic tile, the individual pieces being about ¾ inch square set on a concrete base of sand and cement mortar. He found 87 pieces of tile missing and 93 damaged. He expressed the opinion that there was not enough cement in the mixture and that no expansion joint, such as a brass strip, had been inserted to allow for contraction and expansion in cold and warm weather.. He could lift the little squares of tile and the cement mortar was not adhering to them. He estimated the condition had existed for two years or more and said it was progressive. Also there was soot and dirt in the loose ingredient he picked up there. He had encountered similar conditions in cracked sidewalks and pavements.

On cross-examination he said in his opinion the condition had existed for more than a year, but couldn't state it was a fact. Further on in cross-examination he said he had to have some leeway in his estimate, but he could tell that all of the disintegration he had found occurred within one, one and a half, two, or two and a half years. The next day after Jones had made his examination two photographs of the vestibule floor were taken for respondent which showed four or five patches

of tile missing along the junction line between the vestibule floor and the sidewalk. The assistant manager of the store at the time respondent fell and when these two photographs were taken, said they correctly showed the then condition of the vestibule floor, but that the tile began to chip *after* respondent was hurt and *before* the photographs were made, because carts and things ran over the tile floor. Another photograph taken 23 months after the casualty showed the condition of the floor much worse.

Another photograph, Exhibit 1, was taken at the instance of appellant on April 24, 1946, four days after the casualty. Also a greatly enlarged photographic copy of this, almost 16 by 20 inches, was made. Neither shows any patches of missing tile, though in the large copy a heavy black line marks the junction of the concrete sidewalk and the vestibule tile floor. But the photographer of these said he held his camera at eye level, and did not slant it downward to show the tile detail. The photograph Exhibit 1 takes in the top of the building, and the enlarged copy reaches the top of the big display window, whereas respondent's photographs are directed at the sidewalk and vestibule tiling.

Inasmuch as appellant assails only the testimony of the respondent's expert Jones, and does not complain of the insufficiency of her evidence as a whole, we shall not go further into the facts. Appellant's first point is that Jones' testimony was inadmissible because he was not qualified as an expert, and because his testimony was based on speculation and conjecture and facts not in existence at the time of the casualty. On the latter issue his counsel cite authorities holding the opinion of an expert must not be founded on mere assumption or surmise, but on facts within his knowledge or hypothetical questions embracing proven facts, citing: 20 Am. Jur., p. 661, §787; Vitale v. Duerbeck, 338 Mo. 556, 566(4), 92 SW. (2d) 691, 695(8).

That will be conceded. But we think the witness Jones showed he had sufficient experience and acquaintance with the phenomena involved to testify as an expert. 20 Am. Jur., p. 656, § 783. And while he conceded he needed "leeway" in stating how long the condition of disintegration he found had existed, that did not mean his opinion was valueless. He was experienced and stated his belief after physical inspection as to the causes of it—insufficient cement in the mortar and lack of expansion strips, the first of which undoubtedly would make the condition permanent. And he estimated all of it had existed for a minimum of a year to a maximum of two years and a half. This was not a mere guess. What doctor can state with certainty how long some certain illnesses of a patient will continue and how they will eventuate? And what lawyer can do the same with respect to a lawsuit? It must be remembered also that the respondent's husband testified he made an examination of the vestibule about a week

after the casualty and even then found five or six patches of tile missing at the edge of the floor. We think Jones qualified as an expert, and that his opinion was not based on speculation and conjecture.

The second assignment is that respondent's given instruction No. 2 was erroneous, because it purported to cover the whole case, and predicated appellant's negligence upon mere knowledge of the defective construction of the vestibule floor, permitting the condition to exist, and failure to repair it. Appellant asserts the instruction should have required a further finding that appellant *should,* by the exercise of ordinary care, *have foreseen or anticipated the danger,* citing Nephler v. Woodward, 200 Mo. 179, 188-9(6), 98 SW. 488, 490-1(4) and later decisions referring to it, in particular Brown v. Reorganization Inv. Co., 350 Mo. 407, 418-9(5), 166 SW. (2d) 476, 481-90(9).

The Nephler case held a hole three inches in diameter in the aisle carpet of a theater "is not ordinarily such a menace to life or limb as would justify the court in assuming it to be dangerous to persons passing over it;" and that the question whether in the particular instance it was so dangerous that the theater proprietor *ought* to have *recognized* the fact, should have been submitted concretely in an instruction on that general issue—though the omission was held cured by another instruction in that case.

On that point instruction No. 2 in the instant case required the jury to find [quoting substantially]: "that the missing or loose and insecure tile in the vestibule floor made said entrance way not reasonably safe for persons using the same * * *; that (appellant) knew, or by the exercise of ordinary care, by and through its agents and employees, could have known of said condition in time to have repaired or corrected the same; and that in permitting said condition to exist and in failing to repair the same, (appellant) did fail to furnish (respondent) with a reasonable safe place to enter said store and was thereby guilty of negligence, from which respondent's injury resulted"—then the verdict should be for respondent.

We think this instruction is not open to the objection made in the Nephler case. It specifically required the jury to find as a fact that the missing tile condition *did* make the vestibule entrance unsafe; that the appellant *knew* it or *reasonably could have known of it* and repaired it; and that in failing to do so, appellant negligently failed to furnish respondent a reasonably safe entrance way, as a result of which she was injured. This contention is overruled. Brown v. Reorganization Inv. Co., supra, 350 Mo., l. c. 419(5), 166 SW. (2d) l. c. 482(10); Devine v. Kroger Groc. Co., 349 Mo. 621, 630(2), 162 SW. (2d) 813, 816(5); 3 Raymond, Missouri Instructions, Pocket Part, §8363, p. 32. Taken from record, DeMoulin v. Roetheli, 354 Mo. 425, 189 SW. (2d) 562.

Appellant's final point is that the damage award of $10,000 is excessive. As stated, the respondent was 70 years old. She suffered a trochanteric fracture of the left femur, meaning the top of the upper leg bone where the muscles attach and the neck of the femur fits into the hip socket. As we understand, the neck of the femur was separated, displaced, bent downward and twisted. The fracture was repaired by surgery and the insertion of a Peterson nail. The operation was successful, but her left leg will be permanently one-half inch shorter than the right leg, causing loss of rotation in turning the leg inward and outward and causing her to limp. The operation was performed without the use of a general anaesthetic and respondent was conscious throughout.

There was some delay after the casualty before she was taken to the hospital and she suffered intense pain. A type of psychosis or mental aberration developed and lasted for about three weeks. She was fearful she would be thrown out the window and killed. Her surgeon, Dr. Irwin Horwitz, testified she will probably suffer recurrent pains for the rest of her life, due to the maladjustment of the pelvic region occasioned by the difference in the length of her legs. Her surgeon made daily visits for the first five weeks. She was under his care for a year and six days. In our opinion, under such cases as Ayres v. Key, 359 Mo. 341, 221 SW. (2d) 719, 723(4) a remittitur is not called for.

The judgment is affirmed. All concur.