**Constance L. LINDSAY, Respondent,**

v.

**Don McMILIAN, et al., Appellants.**

**No. WD 33331.**

Missouri Court of Appeals,
Western District.

Feb. 15, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 29, 1983.

John J. Phillips, Independence, for appellants.

Gene P. Graham, Independence, for respondent.

Before DIXON, P.J., and KENNEDY and LOWENSTEIN, JJ.

KENNEDY, Judge.

Plaintiff had a verdict and judgment against defendant Don McMilian, who was a partner with Troy Vines in a retail used car business from which she had purchased a 1975 Torino automobile, for $1,000 actual damages and $2,500 punitive damages for fraudulent misrepresentation. Defendant Don McMilian appeals.

We find no reversible error in the points he has presented, and we affirm the judgment.

Plaintiff's action against the defendants was based upon an allegedly false representation made to her to induce her purchase of the automobile, that the car was "in good condition" and that it was "a good running car," representations which proved to be quite false. The case was submitted to the jury upon an instruction which hypothesized (among other facts, per MAI 23.05) that Troy Vines, one of the partners, who actually negotiated the sale of the automobile to the plaintiff and made the false representations, "did not know whether the representations [were] true or false."

## I

We take up first defendant's argument that plaintiff made no submissible case in that she failed to prove that the representation (that the car was in good condition) was false when made. His argument is that the defects could have originated after the sale took place, and that the car could have been in good condition at the time of the sale.

■ We conclude that the evidence was sufficient to prove prima facie that the car was not in good condition when the representations were made to Mrs. Lindsay, and that the representations were therefore actually false. Viewing the evidence and inferences most favorably to the successful plaintiff, as we must, the record supports the following facts. Plaintiff Constance Lindsay agreed to buy the 1975 Torino on May 10, 1978, closing the purchase the next day, on May 11. The asking price was $1,700 and Mrs. Lindsay agreed to pay that price without haggling. It was the first car

Mrs. Lindsay had bought and she had no knowledge of the value of the car. The car, she testified, was "pretty", the motor clean in appearance. She had been taken to the defendant's used car business by a Mr. Rudy Langer, whom she described as a friend of hers. The business was operated under the name of "Plaza 23 Motors" in Independence. Mr. Langer had a "shop" and himself had a car dealer's license.

Two days after Mrs. Lindsay had bought the car, a parking attendant where she parked her car at work in downtown Kansas City told her she had an oil leak and should have it checked out. She took it to a service station to be checked. She was not permitted to testify what report she got from the service station, but as a result of it she took the car back to defendant Vines and demanded the return of her money. Mr. Vines declined, but offered to allow her $1,000 trade-in on another car on the lot, an offer she declined. This took place about two weeks after the purchase, Mrs. Lindsay estimated. Mrs. Lindsay testified that the car was consuming a quart of oil on her way to work, and another quart on the way back home. We estimate that the distance between her home and her work was about eight miles.[1] She took the car to the Triple-A Diagnostic Center on June 9. They were unable to complete the inspection because of the oil leak. Mr. Williams of the Triple-A Diagnostic Center said they were unable to complete the checking because "the oil leak's too severe, had to add two quarts of oil to get it out of the shop so they could drive it away." Mrs. Lindsay had a rebuilt motor installed in the car at a cost of $350, and spent another $70 to repair hoses and air conditioning.

Mr. Langer testified that Mrs. Lindsay called him two days after she had purchased the car and told him it was heating up. Mr. Langer had the car towed to his shop. The water pump was "busted" and had to be repaired, and a hose replaced. Mr. Langer paid for the towing and for the repairs and did not charge Mrs. Lindsay for it—"[n]ot as mad as she was." She also complained to Mr. Langer of the car's

---

1. 9613 Truman Road, Independence, to 21 West 10th Street, Kansas City, Missouri.

smoking. Mr. Langer said the automobile would have been worth $1,900 if it had been in good shape, but was worth $1,000 in the condition it was in.

The odometer showed 40,027 miles when Mrs. Lindsay purchased the car. It had floor mats on the floor, which she did not raise to look under. The floorboard, or the carpet under the floor mat was worn through.

On August 24 Mrs. Lindsay traded the car to another dealer on another automobile.

Defendant McMilian testified that the automobile had. been driven in from St. Joseph where it had been purchased at auction. It had not been on the lot long enough for the engine to cool. The person who had driven it from St. Joseph to defendant's lot was deceased. Mr. McMilian's wife testified that the car was sold to Mrs. Lindsay for the same price as had been paid for it at auction, with no profit. Mr. McMilian said the loan value of the automobile was $2,250. After testifying on cross-examination that its value would have been "at least that much" he gave the following testimony:

Q. And this is the value that you placed upon it; is that correct, Mr. McMilian, assuming that the car was a good car in good running condition?

A. That would be true.

Q. All right. Now, would you tell the jury, please, would it make a difference in the value of the car on that day if the engine was actually shot?

A. That's why she bought it for some $500.00 less, sir.

From the evidence of the severity of the condition as it existed so soon after the sale, coupled with the fact that the sellers sold it without any profit, and the revealing testimony of Mr. McMilian which we have quoted in the preceding paragraph, we are satisfied that the jury could have found that the defects existed at the time the representations were made.

II

Defendant's second point is aimed at plaintiff's verdict-directing instruction. The instruction hypothesized that the representation was made that the car was a good-running car and in good condition; that defendant intended that plaintiff rely on the representation; that the representations were false; and "[t]hird, Troy Vines did not know whether the representations was (sic) true or false;" the materiality of the representation, plaintiff's reliance; plaintiff's ordinary care in so relying; and plaintiff's resulting damage.

It is the hypothesization enclosed in quotation marks above that defendant criticizes, i.e., that "Troy Vines did not know whether the representations was true or false." The instruction is patterned upon MAI 23.05 without deviation, but defendant says that the quoted words "misstate the law of fraudulent misrepresentation." He says that the quoted paragraph should read: "Defendant knew he did not know whether the representation was true." The instruction as given, defendant says, "permits a jury to find liability for a negligent or innocent misrepresentation under a statute directed at fraud." He calls our attention to language in *Wilson v. Murch,* 354 S.W.2d 332, 338–39 (Mo.App.1962), in which the court held that to make a case for fraudulent misrepresentation,

> it is not necessary that it be shown that defendant had actual knowledge of the falsity of the facts stated by him. It is sufficient that he made the representations with the consciousness that he was without knowledge as to their truth or falsity, when, in fact, they were false.

He also cites Judge Welliver's dissent in *Huttegger v. Davis,* 599 S.W.2d 506, 516 (Mo. banc 1980),. where a footnote says, "More properly, the instruction should express the requirement that the defendant made a false representation 'with the consciousness that he was without knowledge as to their truth or falsity.' "

█ It would be enough, perhaps, to answer defendant's point by saying that MAI instructions, promulgated and approved by the Supreme Court, are authoritative if applicable to the factual situation—and we repeat that there is no issue

of the applicability of MAI 23.05 to this factual situation—and this court, as was the trial court, is bound by them as surely as it is bound by Supreme Court cases and rules. Supreme Court Rule 70.02(b); *Eckert v. Dishon,* 617 S.W.2d 649, 650 (Mo.App.1981); *Weltscheff v. Medical Center of Independence,* 604 S.W.2d 796, 802 (Mo.App.1980). See also Missouri Approved Jury Instructions, p. XL (3d ed. 1981). Our course, should we believe the MAI instructions do "misstate the law," as defendant argues, is to transfer to the Supreme Court under Mo. Const. Art. 5, § 10 (1945, amended 1976).

■ We do not agree with defendant that the criticized language is a "misstatement of the law." We conclude that the language was deliberately used and deliberately retained in the instruction first by the Committee, then by the Supreme Court. They had before them, and quote in the Committee's comment on MAI 23.05, the very language in *Wilson v. Murch,* supra, which the defendant said should have been used in the pattern instruction in lieu of the language which was used. At the time of its 1981 revision of MAI 23.05 they had before them also the footnote from *Huttegger v. Davis,* supra. It is therefore clear that the Supreme Court has considered and rejected the language for which the defendant contends. It is not necessary for us to justify the decision of the Supreme Court and its instruction committee, but evidently they believed that it would be drawing it out too fine to require a finding of another level of knowledge on the part of the speaker. When the instruction says, "defendant did not know whether the representation was true or false," it is implied, without requiring a specific finding to that effect, that the defendant knew he did not know. See *Brown v. Bryan,* 419 S.W.2d 62, 67 (Mo.1967).

MAI 23.05 did not "misstate the law," and defendant's point is denied.

### III

For his third point, defendant attacks the sufficiency of the evidence to support a punitive damage award. Specifically he attacks the sufficiency of the evidence to authorize a punitive damage instruction.

■ The instruction given was MAI 10.01. Defendant says that Mr. Vines' representation might have been innocent or might have been ordinary negligence, neither of which would justify the giving of a punitive damage instruction. Assuming the evidence would have justified a finding that Mr. Vines' misrepresentation was innocent or merely negligent, still the evidence which we have recounted above also justified a finding by the jury that his representation was false and made (in the words of MAI 10.01) "willful[ly], wanton[ly], or malicious[ly]." Defendant says that the jury might under this instruction award punitive damages even for an innocent or a merely negligent representation, but that plainly is not so. The instruction expressly requires a finding of willfulness, "intentional-ness" or malice as a predicate for an award of punitive damages, and it would disallow punitive damages if the misrepresentation was found to be innocent or merely negligent. The facts we have recited above are sufficient to justify a punitive damage instruction, and an award of punitive damages by the jury.

Finding no error, the judgment is affirmed.

All concur.