Robert **MAPLES** and Shirley Maples, his wife, Plaintiffs-Respondents,

v.

**CHARLES BURT REALTOR, INC.,** Defendant-Appellant.

No. 13455.

Missouri Court of Appeals, Southern District, Division One.

April 9, 1985.

Motion for Rehearing or to Transfer to Supreme Court Denied April 17, 1985.

Application to Transfer Denied May 29, 1985.

Glenn R. Gulick, Jr., Hershewe & Gulick, Joplin, for plaintiffs-respondents.

James E. Brown, Joplin, Bruce K. Kirby, Keeter, Karchmer, Nelms, Kirby & Johnson, Springfield, for defendant-appellant.

TITUS, Presiding Judge.

Defendant Charles Burt Realtor, Inc., appeals from a judgment entered on a jury verdict for plaintiffs Robert and Shirley Maples. The gravamen of plaintiffs' action sounds in fraud, the principal alternative contentions to the effect that defendant, through its agents, either made an affirmative misrepresentation to plaintiffs concerning the condition of a home plaintiffs purchased through defendant or failed to dis-

close to plaintiffs, contrary to alleged duty, certain facts about that home. More specifically, plaintiffs base their charge of affirmative misrepresentation upon defendant's having "provided" them with a termite inspection report showing the home in question to be free of termite infestation at a time when termites constituted at least an incipient scourge. As for the alternative theory of failure to disclose, plaintiffs assert that a previously completed termite inspection known to defendant revealed termite damage to some extent and that defendant was duty-bound to disclose this fact, notwithstanding the existence of the subsequent "clean" report. Defendant's numerous points assail the trial court's determinations relative to these and other issues.

The events leading to the filing of this action commenced in the spring of 1978, when Mr. and Mrs. Richard Porath decided to sell their home at 2407 Montana Place, Joplin. The Poraths listed their home with defendant, through whose services Mr. and Mrs. Robert Tignor were procured as buyers. The Poraths and Tignors entered into a contract on April 25, 1978. One of the printed terms of this standard real estate contract provided that "Seller agrees to deliver to buyer prior to the date of delivery of deed a termite certificate issued by a licensed termite inspection company showing subject property to be free of any visible termite infestation." In regard to this item Mr. Porath testified, "I didn't know who to get to have the termite inspection made so I just asked my Realtor, Ron Coffey [then a salesman for defendant], and they (sic) said they used Mr. Plimmer

on occasions, so I said, 'Go ahead and get him.' "

An inspection of the subject premises was done on May 15, 1978, by Bill Longstaff, an employee of Mr. Plimmer. Mr. Porath testified that Ron Coffey told him sometime shortly thereafter that Mr. Plimmer "wanted to speak with me because he had found something at the house, so I called [him] and that is how I found out about a report." [1] Mr. Plimmer related to Mr. Porath that "evidence of past prints" had been discovered at the house but that "[t]hey are not there now," "[t]here is no damage." Nevertheless, Mr. Plimmer suggested it would be a good idea to have the house treated while it was vacant. He quoted a figure of "I think $225, it was over $200" as an estimate of the cost of treatment. Asked by Mr. Plimmer if he wanted the treatment done, Mr. Porath replied, "No, I will get back with you."

As it happened, Mr. Porath did not have Plimmer perform the treatment. He testified he told Ron Coffey he had received an estimate from Plimmer he "personally felt ... was kind of high" and that he "wanted another opinion or estimate." Mr. Coffey was said to have responded by saying "that is your business, you can do that if you want." Mr. Porath did not obtain another inspection or treatment estimate in connection with the "Tignor deal," as it "fell through" when the Tignors were unable to obtain financing.

Defendant continued its sales efforts on behalf of the Poraths and within two months procured as prospective buyers Mr. and Mrs. Robert Maples, plaintiffs herein.

---

1. Mr. Porath never actually saw the report done by Plimmer's company (hereinafter "Plimmer report") until he was deposed in connection with the instant litigation. A few observations about this report are in order. It was completed on a form provided for V.A. loan applicants and featured a diagram of the layout of the house, upon which appeared two notations indicating "Live termites" in the garage area. Under the heading "Federal Damage Report" appeared the questions "Was there evidence of previous infestation?" and "Is there evidence of existing damage?" Both of these were answered in the affirmative by means of an "X" in the respective "Yes" box. Additional comments by the inspector indicated "[j]ust minor damage to plate at area in garage marked TD on graph." An affirmative indication was also made in response to the report form's question "Has structure been treated for termites?" and Plimmer was listed as the company which performed such treatment. Near the bottom of the form in smaller print appeared the question "Was structure treated for subterranean termites?" This was also marked "Yes." The expressions "Job price $228.23" was written in the diagram portion of the form.

Plaintiffs had previously enlisted the aid of Pat Carney, a salesman for defendant, in finding a home. Perusal of defendant's "multi-list book" resulted in their discovery of the Poraths' house, which Mrs. Maples said "caught our eyes." She and her husband decided to look at it, despite that the list price was "higher than what we were interested in paying."

During their brief ("about 20 minutes") inspection, plaintiffs observed "obvious" defects, such as holes in the bathroom door and garage ceiling. Mr. Maples suggested that perhaps these problems could be remedied before he and his wife bought the house. Mr. Carney evidently took note of this request, as repair of the above-mentioned and other defects was made a condition of sale in the ensuing contract. Plaintiffs made but one other visit to the house, solely to measure for a stove they planned to install.

On July 10, 1978, plaintiffs and the Poraths entered into a contract, on a standard form provided by defendant. Mr. Maples testified that before signing or even reading the contract he inquired *sua sponte* of Ron Coffey about a termite report. Mr. Coffey was said to have replied that "he already had one, don't worry about it" and that "he ... would take care of it." This exchange constituted the extent of the conversation at the time of contracting in regard to a termite report. No such report was shown to Mr. Maples at that time.

Mr. Porath stated he was aware that, per the contract, he had to furnish a termite inspection certificate. Asked at trial if Ron Coffey had told him to get another certificate besides the one previously completed by Plimmer for the Tignor contract, Mr. Porath responded: "No, I think I just on my own felt that I had to get one at the time because we had another offer, to get my other estimate, so I did that on my own." Further testimony by Mr. Porath on this subject was as follows:

Q. [D]id you get the other inspection in mind with getting an estimate that would be cheaper than Plimmers?

A. Right.

Q. What happened next, how did you get the people to do the inspection over, who did you get?

A. Well, I didn't know anybody else to do the termite inspection, ABC Termite, they answered their phone, that is the man we had.

Q. And you told them to come out?

A. I said, 'I have a house for sale, I need it inspected.'

Q. Did you ever get a copy of their report?

A. At the closing I saw a pink slip saying that the house was inspected.

Q. Who furnished it to you at closing?

A. Ron Coffey.

The closing was conducted at a Joplin office of Farm and Home Savings and Loan Association the second week of September, 1978. Plaintiffs had by that time moved into the subject premises, having obtained permission to do so from the Poraths, conditional upon plaintiffs' waiver of those contract provisions requiring certain repairs to be made. At the closing, plaintiffs, the Farm and Home administrator and "maybe" Pat Carney were present in one room; in another room were Mr. and Mrs. Porath, their attorney Fred Laas, Ron Coffey, and Allen Burt, defendant's closing agent. Mr. Maples testified that no one at the closing told him there were two termite reports, one showing infestation, the other showing no infestation. He further stated that no one informed him the property had been treated for termites. Asked if he had ever asked "to see the termite report or reports available in the case," Mr. Maples responded: "I believe when I signed my escrow to closing ... I saw an ABC Report ... saying the house was free and clear...." Mr. Porath testified that when his attorney asked him why there were two termite reports, he responded by saying he had wanted another estimate of the cost of treatment. Ron Coffey was said to have had in his possession both the Plimmer and ABC reports as of the closing. Mr. Porath stated, "I asked Ron whatever happened to the second [i.e., ABC] report, what do we

have to do, and he said, 'Here it is,' and handed it to me, and I said, 'It is free and clear, there is nothing,' I said, 'There is nothing at all, no nothing, free and clear.' " Mr. Coffey was said to have then placed the Plimmer report "in his file." As noted supra, n. 1, Mr. Porath did not see that report until after the commencement of this action.

Within one month after plaintiffs moved into the house Mrs. Maples discovered two "whitish green worms" beneath "a very neat row of dirt" along the door facing between the kitchen and dining room. She testified that when "I touched the base of the door facing then I did not touch it with pressure, I touched it, it crumpled, it just began to crumple around my hand...." She immediately called defendant's office and told Pat Carney she suspected termite infestation, to which Mr. Carney was said to have responded, "No problem, I will call Plimmer." When Mrs. Maples thereafter located the termite report she and her husband had received at the closing she discovered it had been prepared by ABC Pest Control and not Plimmer.

The following day Mrs. Plimmer called Mrs. Maples and told her that Plimmer would be unable to perform termite treatment to her home and that Plimmer was not the company that had done the termite inspection in connection with the Maples-Porath transaction. Mrs. Maples related that Mrs. Plimmer told her that Plimmer had done an inspection of the house "for another couple that was going to buy [it] before you came along, and [that] we found termites there, and for some reason or another there was never a key available or entry to the property or whatever, we just were never allowed to go on the property, and take care of the termite work." Mrs.

Plimmer said that after the first contract fell through "nothing else was ever said."

We reiterate our observation in n. 1, supra, that the Plimmer report indicated treatment had been done. Whether or not that was true and why, if it was not, the inspector would have reported to the contrary, were matters upon which the proof shed little light. The only evidence that any treatment had in fact been done by Plimmer following the May 15, 1978, inspection was the just-mentioned indication on the report itself.

In its first point defendant contends plaintiffs failed to establish a submissible case of actionable fraud in that 1) there was no evidence of any affirmative misrepresentation on the part of defendant, and 2) there was no evidence of any omission or failure to disclose information which defendant had a duty to disclose. We observe preliminarily that the only verdict director among the instructions given to the jury submitted an affirmative misrepresentation theory; presumably, the verdict for plaintiffs was based upon findings made pursuant to that instruction. We are therefore at a loss to divine the pertinence of defendant's contention that plaintiffs failed to make a submissible case on a theory—duty-violative failure to disclose—which was not even submitted. Consequently, our treatment of defendant's first point is confined to resolution of the question whether plaintiffs made a submissible case of the affirmative misrepresentation brand of actionable fraud.[2]

■ To determine whether plaintiffs made a submissible case we must consider the evidence in the light most favorable to the plaintiffs and accept such evidence as true, giving plaintiffs the benefit of all inferences reasonably to be drawn therefrom and disregarding defendant's evi-

---

**2.** In *Maples v. Porath*, 638 S.W.2d 337 (Mo.App. 1982), we had occasion to consider whether plaintiffs' petition was sufficient to state a claim of fraud against what then were several defendants, Charles Burt Realtor, Inc., among them. We concluded that, as the petition included passable allegations of affirmative misrepresentation and therefore met the standard of suffi-

ciency, it was unnecessary for us to determine whether allegations of non-disclosure by defendant of material defects in the subject premises could constitute a cognizable claim of fraud in this state. Resolution of the case in its present cast is likewise independent of such a determination, which we decline to make gratuitously.

dence except insofar as it aids plaintiffs' case. *Franklin v. Mercantile Trust Co., N.A.,* 650 S.W.2d 644, 648[5] (Mo.App. 1983); *Dockery v. Mannisi,* 636 S.W.2d 372, 376[7] (Mo.App.1982).

The elements of actionable fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Sofka v. Thal,* 662 S.W.2d 502, 506[2] (Mo. banc 1983); *Maples v. Porath,* 638 S.W.2d 337, 338 (Mo.App.1982).

We recall that Mr. Maples inquired of Ron Coffey about a termite report just prior to signing the Maples-Porath contract on July 10, 1978, and that Mr. Coffey responded by saying "he already had one, don't worry about it," that he "would take care of it." The only termite report Mr. Coffey could then have "already had" was the one prepared by Plimmer showing termite damage; the ABC report showing the house to be "all clear" was not made until August 25, 1978. At the closing the second week in September, 1978, plaintiffs saw only the ABC report. Especially in view of the importance Mr. Maples appeared to attach to the matter of a termite report during pre-contracting discussions with Mr. Coffey, we think the latter's July 10 statements to the former, considered in relation to the presentation to plaintiffs of the ABC report at closing, constituted evidence sufficient to raise a jury issue as to whether defendant made a representation concerning the condition of the house. It is well settled that the representation required to establish a cause of action for fraud need not be made in so many words. It can be inferred from all of the circumstances surrounding the transaction. *Johnson v. Allen,* 448 S.W.2d 265, 267[2] (Mo.App.1969), and cases therein cited. Were Mr. Maples to have considered at closing the remarks made by Mr. Coffey

two months prior at the time of contracting, he would, one may reasonably infer, have presumed them to have been made with reference to the ABC report.

Going to the second element of actionable fraud, the falsity of the representation, is Mrs. Maples' testimony concerning her discovery of termites in the home within a month after the closing. When we consider additionally the evidence of the home's infestation as of mid-May, 1978 (when the Plimmer inspection was done), and the confused evidence as to whether treatment had been performed in the interim between that time and Mrs. Maples' discovery, we experience no difficulty in concluding that a jury issue was raised as to the truth of Mr. Coffey's representations.

Mr. and Mrs. Maples both indicated that a "clean" termite report was material to them in their decision to buy the house. We reiterate that Mr. Maples made a point of inquiring about a report prior to signing the contract, that he then told Mr. Coffey he did not "want to buy the house without a report." Thus, there was evidence to warrant submission of the materiality element of actionable fraud.

By the time Ron Coffey told Mr. Maples not to worry about a termite report, that "he already had one," he had already seen the Plimmer report and knew that it revealed termite infestation. Mr. Coffey testified he was not aware that any treatment had been done to the premises in the aftermath of the Plimmer inspection and that, although he did investigate to determine whether or not treatment had been done as indicated on the Plimmer report, he could not tell "one way or the other." He therefore could not have known whether the infestation disclosed in the Plimmer report had in fact been eradicated so as to render appropriate his July 10, 1978, statements of assurance to Mr. Maples. Thus, there was evidence sufficient to raise a jury question as to the fourth element of actionable fraud, the speaker's knowledge

of the falsity of his representation or his ignorance of its truth.

We likewise find the fifth element established by the proof. Giving plaintiffs the benefit of all inferences reasonably to be drawn from the evidence, as we are obliged to do, we conclude that a jury issue was raised as to whether Mr. Coffey intended that his statements be acted on by plaintiffs and in the manner reasonably contemplated. That Mr. Coffey did not candidly reveal the Plimmer report results to Mr. Maples at the July 10, 1978, meeting betokened an understandable, though arguably inexcusable reluctance to have the sale upset. It could be reasonably inferred that Mr. Coffey intended his assurances regarding the condition of the home to put at ease the minds of plaintiffs and thereby cause them to consummate the transaction.

As for the requirement that the hearer be ignorant of the falsity of the representation, Mrs. Maples stated that she never knew about the Plimmer report prior to the closing, that she did not know the property had not been treated for termites. Before she and her husband bought the property she "had no idea" it was or had been plagued by termites. Mr. Maples testified that no one ever told him the house had not been treated or that it had termite damage.

Plaintiffs' reliance on the truth of defendant's representation is sufficiently established by their own categorical assertions. Further, they clearly had a right to rely upon defendant's representation, which, as we have noted, related to a material aspect of the sale. Defendant's salesman Ron Coffey made the representation while acting on behalf of the Poraths, who,

as sellers, were obligated by the contract to provide plaintiffs with a termite certificate showing the premises to be free of infestation. That the representation—encompassing provision of the ABC report to plaintiffs at the closing—was made by defendant in discharge of its principal's contractual obligation is, in our view, a sufficient basis for concluding that plaintiffs had a right to rely on it.

Finally, there was evidence upon which to base submission of the injury element of actionable fraud. That plaintiffs bought the house on the assumption that it was free of termite damage and would not have bought it had they known the true facts adequately demonstrates a proximate causal connection between representation and damage. Although our treatment of defendant's seventh point, infra, demonstrates our misgivings concerning the appropriateness of plaintiffs' evidence of damage, for present purposes we regard it as easily within range of reasonable inference that some damage was in fact sustained.

Our thorough examination of the record, considered with reference to the requirements of an actionable fraud cause of action, has left us convinced that plaintiffs made a submissible case. Defendant's first point is therefore denied.

In its second point defendant contends the trial court committed instructional error in three particulars, all related to Instruction No. 6, the verdict director submitted by plaintiffs and read to the jury.[3] Defendant claims initially that plaintiffs presented no evidence in support of the third paragraph of this instruction, requiring the jury to find that defendant "did not

---

3.    INSTRUCTION NO. 6

Your verdict must be for Plaintiffs Robert and Shirler [sic] Maples and against Defendant Charles Burt Realtor, Inc. if you believe:

First, Defendant Charles Burt Realtor, Inc. represented to Plaintiffs that the house at 2407 Montana Place did not have termite damage and termite infestation, intending that plaintiff [sic] rely upon such representation in purchasing the house, and

Second, the representation was false, and

Third, Defendant Charles Burt Realtor, Inc. did not know whether the representation was true or false, and

Fourth, the representation was material to the purchase by Plaintiffs of the house, and

Fifth, Plaintiffs relied on the representation in making the purchase, and

Sixth, as a direct result of such representation the Plaintiffs Robert and Shirley Maples were damaged.

know whether the representation was true or false." Defendant argues that because *Wilson v. Murch,* 354 S.W.2d 332 (Mo.App. 1962), holds it sufficient that the speaker "made the representations with the consciousness that he was without knowledge as to their truth or falsity," plaintiffs were obliged to adduce evidence of such consciousness.

Fortunately, we need not resolve this issue by resort to precedent so practically problematic as to necessitate proving consciousness of ignorance. In *Lindsay v. McMilian,* 649 S.W.2d 491 (Mo.App.1983), the court was faced with a contention essentially identical to that which defendant now advances. After noting, as might we, that the complained-of instructional element was patterned after MAI 23.05 without deviation, the court stated, at p. 494:

> We do not agree with defendant that the criticized language [of MAI 23.05] is a 'misstatement of the law.' We conclude that the language was deliberately used and deliberately retained in the instruction first by the Committee, then by the Supreme Court. They had before them, and quote in the Committee's comment on MAI 23.05, the very language in *Wilson v. Murch,* supra, which the defendant said should have been used in the pattern instruction in lieu of the language which was used.... It is therefore clear that the Supreme Court has considered and rejected the language for which the defendant contends. It is not necessary for us to justify the decision of the Supreme Court and its instruction committee, but evidently they believed that it would be drawing it out too fine to require a finding of another level of knowledge of the part of the speaker. When the instruction says, 'defendant did not know whether the representation was true or false,' it is implied, without requiring a specific finding to that effect, that the defendant knew he did not know. See *Brown v. Bryan,* 419 S.W.2d 62, 67 (Mo.1967).

Instruction No. 6 did not misstate the law and defendant's complaint regarding a dearth of evidence to support a repudiated alternative formulation thereof is denied.

■ Defendant further asserts that Instruction No. 6 was infirm in that it "did not contain the required element that there was a duty to disclose the Plimmer report" to plaintiffs. This contention incorrectly presupposes that that instruction must be viewed as having been based particularly and necessarily on a failure to disclose theory. While it is true that plaintiffs presented evidence no doubt intended to establish both a duty to disclose on the part of defendant and a breach of that duty, they also presented, as we have demonstrated, evidence sufficient to establish a submissible case of affirmative misrepresentation, as framed by Instruction No. 6.

The final prong of defendant's assault on Instruction No. 6 is the complaint that plaintiffs presented no evidence that they were damaged as a result of the alleged misrepresentation. We merge consideration of this claim of error into our treatment, infra, of defendant's point devoted exclusively to the issue of damages.

Given our resolution of defendant's first and second point, we need not consider its third, in which defendant complains of a lack of competent evidence that it had a duty to disclose the Plimmer report to plaintiffs. We have already concluded that, owing to the submissibility of plaintiffs' case of affirmative misrepresentation and its submission under an appropriate instruction, no claims of error relating to a failure to disclose theory need be entertained.

Defendant in its fourth point renews its attack upon Instruction No. 6, plaintiffs' verdict director, contending it erroneously failed to require the jury to find that Ron Coffey was an agent of defendant and was authorized to make representations on defendant's behalf. This complaint is bottomed, of course, on the assumption that the agency of Mr. Coffey was a matter of dispute under the proof.

Defendant provides us with no specific reference to the record wherein an issue of

agency may be noted to arise and our perusal of the record has left us at a loss to discern any such controversy. Defendant points to the testimony of Charles Burt, who stated that Ron Coffey was not authorized to omit any materials from a client's file and that defendant required such reports as those involved herein to be included in client files. This testimony, it is argued, established that the actions of Ron Coffey in connection with the transaction in question were beyond the scope of his authority and therefore cannot be considered to have been actions of defendant.

The short answer to this contention may be found in *Tietjens v. General Motors Corp.*, 418 S.W.2d 75 (Mo.1967), and the authorities therein cited. Foremost among these latter is *Globe Indemnity Co. v. First National Bank in St. Louis*, 133 S.W.2d 1066, 1071[3, 4] (Mo.App.1939), in which the court noted:

There is a wide distinction to be drawn between the authority of an agent to commit a fraudulent act, and his authority to transact the business in the course of which the fraudulent act is committed.... 'The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent.'

■ Thus, it matters not a whit, so far as defendant's liability is concerned, that it never specifically authorized Ron Coffey to practice fraud. The representations in question were clearly made in the course of his agency and by virtue of his authority as agent. Defendant's fourth point is denied.

In its fifth point defendant claims the trial court erred in sustaining plaintiffs' motion to strike its third affirmative defense and its motion in limine to preclude presentation of further evidence concerning that defense. The affirmative defense referred to was based on a printed exculpation clause contained in the Maples-Porath contract which provided:

"It is further understood that CHARLES BURT, Realtor, makes no guarantee or representation as to title of said real property, or discrepancies that a survey may reveal, or as to the repair or condition of any of the buildings or improvements situated upon said above described real property."

■ We find the second of two reasons proffered by plaintiffs in support of their motion to strike an especially accommodating peg on which to hang our collective hat, so far as this point is concerned. "A party simply may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." *Slater v. KFC Corp.*, 621 F.2d 932, 935 (8th Cir.1980), citing *Beshears v. S–H–S Motor Sales Corp.*, 433 S.W.2d 66, 71 (Mo.App.1968). The rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties does not apply to fraudulent representations made for the purpose of inducing a party to enter into such contract. *Horwitz v. Schaper*, 119 S.W.2d 474, 481[4] (Mo.App.1938). See also *Burns v. Vesto Co.*, 295 S.W.2d 576 (Mo.App. 1956). The above-cited authorities, in sum, reflect this state's subscription to the view so well set forth in 17 Am.Jur.2d, Contracts, § 191, pp. 558–559:

One of the parties to a transaction or agreement memorialized by a writing may attempt to exclude from consideration, in the event of subsequent controversy or litigation, any statements, remarks, or representations which may have been made during the negotiations, or any such representations which may not be included in the writing itself. Such efforts at exclusion have generally been unsuccessful where such statements or representations are found to have been made fraudulently or to be of such nature that a charge of fraud may be predicated thereon. A provision in a writing that no representations were made to procure the contract, that neither party shall be bound by any representation not contained therein, that the writing contains the entire agreement or all the terms, and that there is no war-

ranty not specifically set forth in it, or that the representee does not rely on representations by the other party, and expressly waives any claim on account thereof, does not, in most jurisdictions, preclude a charge of fraud based on oral representations or proof of what representations were made.

■ Defendant refers us to *Luli Corp. v. El Chico Ranch, Inc.*, 481 S.W.2d 246 (Mo.1972), a case which involved an alleged fraudfeasor's successful invocation of a disclaimer. However, *Luli* may readily be distinguished from the case before us on the ground that the disclaimer involved therein was both explicit and specific as to that which it disclaimed. The exculpation clause contained in the contract here in question was nothing more than a printed "boilerplate" recital obviously intended to be of general application. As such, it was wholly ineffective to immunize defendant from liability for specific fraudulent representations. Defendant's fifth point is denied.

■ In its sixth point defendant assigns as error the trial court's admission into evidence of the testimony of plaintiffs' purported expert witness on the subject of damages and his itemized list of damages and costs of repair. It is said that this evidence was based upon speculation and conjecture and represented the product of observations so remote in time from the relevant occurrences as to cause it to be "prejudicially immaterial." We disagree. It appears from the record that this witness's testimony regarding the extent of termite damage to the house and the necessity of repairs was based on his actual inspection of certain areas of the house and not upon conjecture as to unseen damage.

In any event, the admission or exclusion of expert opinion testimony is a matter largely within the discretion of the trial court and exercise of that discretion will not be interfered with unless it plainly appears that such has been abused. *Superior Ice & Coal Co. v. Belger Cartage Service, Inc.*, 337 S.W.2d 897, 906[8] (Mo.1960); *Keller v. International Harvester Corp.*, 648 S.W.2d 584, 592[11] (Mo.App.1983).

■ As for the argument that the testimony of plaintiffs' expert was based on observations made more than four years beyond the relevant time frame, we think it adequately answered by reference to the fact that plaintiffs' expert responded affirmatively to a hypothetical question in which he was asked whether the repairs he testified to as necessary were made so by termite damage which existed on the date plaintiffs bought the home. Use of the propounded hypothetical question [4] enabled plaintiffs to satisfy the basic requirement that the opinion of an expert witness must not be founded on mere assumption or surmise, but on facts within his knowledge or upon hypothetical questions embracing proven facts. *Hyman v. Great Atlantic & Pacific Tea Co.*, 359 Mo. 1097, 1101, 225 S.W.2d 734, 736[2] (1950). The question embodied substantially all material facts relating to the subject on which the judgment of the witness was sought. *Klaesener v. Schnucks Markets, Inc.*, 498 S.W.2d 555, 559[5] (Mo.1973). It was not improper that the question was designed to elicit an opinion as to when and why a particular circumstance obtained. Any doubts as to the truth of the hypothesized facts or the reasonableness of the witness's inferences therefrom were for the jury to entertain

4. Q. One more question here, I want you to assume that the Maples did purchase this home in September of 1978, discovered termites in the fall of 1978, that the termite damage that you saw existed at the time the Maples purchased the home in September of 1978, that Mr. and Mrs. Maples had the home treated for termites in the spring of 1979, as soon as the weather permitted, and that there has been no further evidence of any termites existing in the home since the home was treat-

ed, assuming all these facts to be true, in your opinion as a contractor and home repairer, do you have an opinion as to whether the repairs you've testified about that are necessary, are necessary because of termite damage that existed in the home of Robert and Shirley Maples on the date they bought the home?

A. Well, assuming that there hadn't been termites since that date, I would say that that is correct.

**214**

and resolve. 31 Am.Jur.2d, Expert and Opinion Evidence, § 53, at p. 560; *Edwards v. Rudowicz*, 368 S.W.2d 503, 506[5] (Mo. App.1963). Defendant's sixth point is denied.

Defendant's seventh point is to the effect that plaintiffs provided no competent evidence of their damages, given that the appropriate measure of damages in a case such as this is that set forth in Instruction No. 8 (patterned precisely after MAI 4.03): "the difference between the actual value of the house ... on the date it was sold to [plaintiffs] and what its value would have been on that date had [it] been as represented." Defendant claims that, as there was "absolutely no evidence" to establish these values, plaintiffs failed to make a submissible case as to actual damages. We agree.

■ A thorough examination of the record reveals that the only evidence offered by plaintiffs with respect to damages went to establish the cost of repairing past termite damage and the cost of treatment to prevent future infestation.

In *Walker v. Woolbright Motors, Inc.*, 591 S.W.2d 289 (Mo.App.1979), an instruction based on MAI 4.03 was given. There was no evidence of the difference between the actual value of the property (an automobile) on the date it was sold and what its value would have been at that time had it been as represented by the seller. This court reversed and remanded the cause for a new trial because of that evidentiary deficiency. To similar effect see *Grosser v. Kandel-Iken Builders, Inc.*, 647 S.W.2d 911 (Mo.App.1983).

In the instant case, although the contract price might support a finding of the value of the house as represented, there was no evidence of its actual value. Thus, it was error to submit to the jury via Instruction No. 8 the issue of actual damages.

■ Defendant in its eighth point contends plaintiffs "failed to provide an evidentiary basis upon which to instruct as to punitive damages and failed to make a submissible case as to the issue of punitive

damages." Resolution of this claim is implicit in our resolution of defendant's point concerning actual damages, as the setting aside of an award of actual damages requires the setting aside of an award of punitive damages. *Collins v. Adams Dairy Co.*, 661 S.W.2d 603, 606[3] (Mo.App. 1983); *Linkogel v. Baker Protective Services, Inc.*, 659 S.W.2d 300, 305[9] (Mo.App. 1983).

The focus of defendant's ninth point is a reference to defendant's gross income made by plaintiffs' counsel in the rebuttal portion of his closing argument. It is claimed that the trial court erred in permitting such a reference because 1) the quoted figure, gross income, was an improper measure of defendant's ability to pay punitive damages; 2) there was no evidentiary basis for reference to such figure; and 3) it was inflammatory, as demonstrated by the excessiveness of the punitive damage award.

■ Neither of the only two objections made at trial to plaintiffs' mention of defendant's gross income had as its basis any of the three grounds now advanced on appeal. Thus, there is nothing before us for review. The grounds of objection presented here, not having been asserted in the trial court, may not be considered by this court. *Handshy v. Nolte Petroleum Co.*, 421 S.W.2d 198, 202[10] (Mo.1967). Defendant's ninth point is denied.

We need not pass upon defendant's tenth and final point, as it concerns the size of the actual and punitive damage awards.

Inasmuch as Instruction No. 8, the actual damage instruction, lacked evidentiary support, the judgment is reversed and the cause remanded for a new trial on all issues.

FLANIGAN and GREENE, JJ., concur.