**William J. BESHEARS and Grace L. Beshears, Plaintiffs-Respondents,**

v.

**S-H-S MOTOR SALES CORPORATION, a corporation, Defendant-Appellant.**

**No. 24925.**

Kansas City Court of Appeals.

Missouri.

Oct. 7, 1968.

Howard D. Lay, Donaldson, Lay & Tarver, Kansas City, for defendant-appellant.

L. Glen Zahnd, Newhart & Zahnd, Savannah, W. E. Winbigler, Kansas City, for plaintiffs-respondents.

CROSS, Judge.

Plaintiffs, husband and wife, brought this action against multiple defendants to recover actual and punitive damages for fraud practiced in connection with the sale of an automobile to plaintiffs. In the course of trial to a jury, and prior to submission, dismissals were entered as to all defendants except S-H-S Motor Sales Corporation, a concern doing business in Kansas City, Missouri, under the name "Midwest Motors". The jury returned a verdict awarding plaintiffs $300.00 actual and $2,000.00 punitive damages upon which judgment was duly entered. Defendant S-H-S Motor Sales Corporation has appealed.

The case was tried and submitted on the theory that defendant, undertaking to sell plaintiffs a certain 1963 Dodge automobile, falsely and fraudulently represented (by and through its employees and agents) that the vehicle in question was a "demonstrator" which had been "on the road" for 27 days, (when in fact the automobile had been previously sold and delivered to a prior owner, had been used by that individual for three months, and had been repossessed) ; that defendant and its agents knew such representation was false; that the representation was material to the transaction; that plaintiffs purchased the automobile in reliance upon the truth of the representation; and that as a result plaintiffs suffered actual loss and damage in a sum equal to the difference in the reasonable market value of the automobile as it was represented to be and its actual market value at the time of the sale.

Defendant primarily contends that the trial court erred in denying its motion for a directed verdict, on the ground that plaintiffs failed to sustain their burden of proof to establish the necessary elements of a case of fraud, "Mainly (because) the evidence showed there was no reliance by plaintiffs and no damage". In determining this question we shall assume the truth of every fact and circumstance in plaintiffs' favor shown in evidence, whether by plaintiffs or defendant, and give plaintiffs the benefit of all reasonable inferences which may fairly be drawn therefrom. All evidence and inferences unfavorable to plaintiffs will be disregarded. Under the foregoing limitations, we set out applicable portions of the evidence.

Plaintiff William J. Beshears testified that on July 18th, 1963, he and Mrs. Beshears went to defendant's place of business "to buy a new car." They had previously seen defendant's newspaper and television advertisements of new Dodge Darts, and Beshears had called defendant by telephone to inquire about them. He talked to Don Wright who identified himself as one of defendant's salesmen. In the conversation Beshears inquired "about the ads" and about "what they had", and Wright told Beshears that the company had a "demonstrator" on hand that he might be interested in. When plaintiffs arrived at defendant's establishment Wright showed them the new Dodge Darts that had been advertised. Plaintiffs found those vehicles unsuitable because they were coupes of in-

sufficient size for their family. Other cars were shown plaintiffs, including the "demonstrator" which Wright identified as the one he had mentioned on the telephone—a current model Dodge station wagon with a "Retail Price Sheet" taped on the left rear window listing the cost of the basic vehicle, the items of optional equipment and freight—totaling $3,064.90.

While showing plaintiffs the station wagon Wright referred to it several times as a demonstrator. Plaintiffs also talked to William Waldberg, defendant's sales manager, in Wright's presence. In the course of discussion Waldberg also referred to the car as a demonstrator several times. According to Beshear's testimony: "Mr. Waldberg volunteered the information that it (the station wagon) had been on the road 27 days and turned and said, 'Isn't that right Don?' and Don said, 'Yes'." Thereafter Mr. and Mrs. Beshears "drove the car around the block" and decided that it was suitable for their use. Waldberg "wrote up the sale" and "we completed the transaction." As will be set out more fully hereinafter, the car in question had previously been sold by defendant to another person, titled in his name, and repossessed upon his default. Prior to closing the sale, neither Wright, Waldberg nor anyone else on defendant's behalf divulged those facts to plaintiffs or said anything to indicate the car had been in the possession of any one other than defendant, or that it had been repossessed. Beshears stated that he had no knowledge of and made no inquiry concerning those matters before buying the car "because I had no reason to doubt their (Wright's and Waldberg's) integrity."

As Waldberg was preparing the "buyer's order" Beshears noticed that he employed the word "used" in describing the station wagon. Beshears testified as follows: "A. Well, of course he was on the other side of the desk, but I was casually watching him as he wrote it and I noticed he used the term 'used'. So I asked him why since it was a demonstrator and he said, 'Well, a

demonstrator—' something to the effect that a demonstrator, since it is not a new car, has to be listed technically as a used car. So then I said, 'Well, I want to be sure that this is understood.' So I asked him to write the five year warranty or 50,000 miles on here, which he did, which is written across there (indicating)." As finally written, the buyer's order recites that the car was "Sold with 5500 miles Used", at a cash delivered price of $3,064.90 ($16.90 more than the price at which it was sold to the previous owner), with "5 year warranty or 50,000 miles". Upon delivery of the car to plaintiffs, defendant set the speedometer at zero miles.

After taking delivery, plaintiffs experienced considerable trouble with the car and had to "bring it back" for necessary repairs and adjustments. This involved 8 or 9 "trips" from plaintiffs' home in Grandview to Kansas City, and on two or three occasions Beshears had to leave the car overnight. On a family vacation trip taken soon after purchasing the car, brake trouble developed in North Carolina and new brake shoes had to be installed. Within six weeks after buying the car (and on the day plaintiffs' first payment was due) motor trouble had developed to the extent that "they put new rings and bearings in the car."

Some time after buying the automobile, Mr. Beshears accidentally learned of its previous ownership when he found an owner's manual or warranty book in the glove compartment issued to one "Orville J. Bartlett". A telephone call to that individual revealed that he was the first owner of the car and that it had been repossessed and titled in defendant. When confronted by those facts defendant's general manager Rosenthal admitted their truth, but stated that Bartlett had had the car in his possession "only eight days".

Pressed on cross-examination to state the "difference" between this car, as a demonstrator and as a used car, Beshears testified "* * * (T)here is a world of difference between a demonstrator which

is really a demonstrator in the sense they are advertised and a car that has been sold to another member of the public. * * * (T)he difference with me is that I wouldn't buy a used car in that way. * * * I don't want anyone else's problems, as they usually refer to a used car. * * * I would accept a demonstrator, which I did, on the basis of the reputation and the integrity of the dealer, as being a demonstrator. * * * I would assume that the miles on there had been put on with greater care than possibly if it had been put on by one individual and abused."

Bertram Bartlett, a son of Orville J. Bartlett, testified on behalf of plaintiffs that he and his father operated a restaurant business in Sedalia known as Dixieland Barbecue. The witness negotiated the original purchase of the station wagon on behalf of his father and took delivery of it "brand new" on December 24th (1962). The Bartletts had possession of it until March 29, 1963, (the date of repossession), using it for delivery purposes in connection with their barbecue business. They made trips between Kansas City and Sedalia with it "sometimes seven and eight times a week" to pick up supplies and used it to haul large volumes of meat, steam tables and heavy equipment. "It was used almost as a truck." The Bartletts had no garage and the car was parked outside during the three winter months they had it in their possession.

Robert Ray Davidson, produced by plaintiffs, identified himself as an experienced automobile salesman, who had been in the automobile sales business since 1936 except for three years in "the service" and a year and a half at Lake City Ordnance Plant. He testified that the term "demonstrator" as used in the automobile trade means "a new car that is taken out of stock, preferably a model with the most equipment so it can be demonstrated to the prospective purchaser, and is used to demonstrate the car and it is a car generally considered to be, in a new car dealer's stock as a new car and not a used car. In other words, one that hasn't been titled. When the car is sold it is sold as a demonstrator car and not as a used car"; that "used car" is "one that has been sold to some individual or company and then it is brought back or traded back by a dealer." The witness stated that in his opinion there would be a difference in value of *at least* $300.00 between two identical cars, such as the one Beshears had purchased, when one was a demonstrator and the other had been sold to and used by a member of the public and repossessed.

Both Wright and Waldberg testified as witnesses for defendant. Wright denied that he had told plaintiffs the station wagon was a demonstrator that had been driven only 27 days, but said he didn't know "what Mr. Waldberg said." He testified that he understood a demonstrator was "a new car that has been used in demonstration * * * but never titled." Waldberg had no independent recollection of his transaction with the plaintiffs other than what appeared in the sale documents. He said he didn't recall whether or not he had represented to Beshears that the station wagon "was a demonstrator" and that it had been on the road for only 27 days. He admitted, however, "it is possible I said it."

■ The essential elements of actionable fraud are considered by Missouri courts to be as follows: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. Powers v. Shore, Mo.Sup., 248 S.W.2d 1; Williams v. Miller Pontiac Company, Mo.App., 409 S.W.2d 275.

■ Defendant has not advanced any argument of colorable validity to suggest that any of the first six elements of fraud above enumerated have not been established.

It is our view that plaintiffs have sustained their burden in that respect for reasons here stated. (1) As hereinabove noted, there was evidence before the jury that two of defendant's salesmen represented to plaintiff that the automobile was a "demonstrator" which had been "on the road 27 days". In view of the meaning attributed to the term "demonstrator" by witnesses Davidson and Wright, the jury could reasonably believe that such statements made on behalf of defendant were intended as and were equivalent to representation that the automobile had not been owned by and titled in any person previously. (2) The falsity of such representation is attested by undisputed oral and documentary evidence that Orville J. Bartlett had legally certificated ownership of the car and used it from December 24th, 1962, until it was repossessed on March 29, 1963—a period of time much greater than 27 days. (3) The materiality of the representation is evident from testimony by Beshears to the effect that plaintiffs were willing to buy a demonstrator, which they considered to be a car that had been used only by the dealer in the course of its business, but that they would not knowingly have bought a car that had been previously sold to and used by "another member of the public." (4) The jury *at least* could have believed that the representation was made in reckless disregard of the truth. (5) Since defendant was endeavoring to sell plaintiffs a car and plaintiffs were in the market to buy one, it was logical for the jury to believe that the representation was made with the *intent* that plaintiffs act upon it and purchase the station wagon. (6) That plaintiffs were ignorant of the falsity of the representation may be concluded from Beshears' testimony that when he agreed to purchase the station wagon he had no knowledge that Bartlett had previously owned it.

■ The principal thrust of defendant's contention that plaintiffs did not rely upon the representations made by its salesmen, and had no right to rely thereon, consists of argument essentially couched in the following language quoted from defendant's brief: "Before the sale was complete, plaintiff read the order which said oral representations would not be honored by the company. The order is unequivocal in its terms and declares this to be a used car with 5,500 miles. When Mr. Beshears saw the order he certainly had no right to rely upon something which he recalls was said during sales negotiation involving several cars. * * * (W)hen plaintiff purchased this car after his test drive * * * he had no right to expect or rely upon receiving anything but what the order called for, namely a used car with 5,500 miles." The theory thus advanced is not consistent with Missouri decisions. "The rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties does not apply to fraudulent representations made for the purpose of inducing a party to enter into such contract." Horwitz v. Schaper, Mo.App., 119 S.W.2d 474. The instant question was presented to and thoroughly settled by this court in Burns v. Vesto Company, Mo.App., 295 S.W.2d 576. In that case the plaintiffs bought a television set from defendants which was represented to be new when in truth it was a used set—a fact plaintiffs accidentally discovered some seven or eight months later when they found papers in the back panel of the set identifying a previous owner. Defendants contended that plaintiffs had no right to rely upon and introduce evidence of defendants' oral representations because they had signed a chattel mortgage which recited that it contained the entire agreement and "that there were no representations or warranties unless written into the contract." Ruling the issue we said: "It is no doubt true that the general rule is that the terms of a written contract may not be varied or contradicted by parol evidence. However, when fraud is relied upon, as here, that rule has no application." Also see Tiffany v. Times Square Automobile Co., 168 Mo. App. 729, 154 S.W. 865; National Theatre Supply Co. v. Rigney, Mo.App., 130 S.W.2d

258, 262; Clancy v. Reid-Ward Motor Co., 237 Mo.App. 1000, 170 S.W.2d 161.

Defendant additionally argues that plaintiffs had no right to rely upon the representation because they were negligent in failing to utilize means of knowledge equally available to all parties, from which they could readily have learned the "pedigree" of the automobile, hence, had no right of reliance. Defendant submits that if plaintiffs had exercised ordinary prudence they "could have opened the glove compartment and found the prior owner's book" and thus have known that "the car in this case had been titled to the customer Bartlett". The foregoing suggestion presupposes, without evidentiary basis, that the owner's book was in the glove compartment at the time the parties were negotiating. For that matter, it was for the jury to say whether in the exercise of due prudence plaintiffs should have searched the automobile for documentary evidence relating to its previous ownership and use. See Meyer v. Brown, Mo.App., 312 S.W.2d 158. It is further suggested by defendant that plaintiffs could have divided 27 days into 5,500 miles and determined that the car had been driven 200 miles daily, and thereby have realized that the vehicle was not a demonstrator. In support of this suggestion defendant cites and relies upon Hanson v. Acceptance Finance Company, Mo.App., 270 S.W.2d 143, where this court held that a plaintiff had no right to rely upon defendant's false representation that interest on a loan at 8% had been included as part of the principal, because plaintiff could have determined the true rate of interest by simple mathematical computation and thus have known the falsity of the statement. While the "simple computation" in the Hanson case completely solved the arithmetic problem there involved, the exercise in mathematics suggested by defendant in this case (27 into 5500) would not establish, as a matter of absolute fact, that the station wagon was not a demonstrator. Hanson is not in point. It is our conclusion that there is sufficient evidence in the record to justify submission of the elements of reliance and the right to rely upon the representation involved.

We also find there is substantial evidence. to support submission of the requisite element of "consequent and proximate injury", to-wit: the testimony of plaintiffs' witness Davidson who, after qualifying to the court's satisfaction as an expert witness on automobile value by reason of some twenty-five years experience as a car salesman, testified that the station wagon *as a previously owned automobile* was worth at least $300.00 less than an identical vehicle used *only as a demonstrator*.

The trial court's refusal to direct a verdict in favor of defendant was not error.

Defendant's second point assigns error in the reception of evidence as to the station wagon's defects and malfunctions, the necessary repairs that were required and performed, the "trips" required for those purposes and the attendant inconveniences suffered by plaintiffs. Defendant insists that those subjects of evidence "were not relevant, not pleaded and are not part of their measure of damage and were used to prejudice the jury." The point is without merit. Clearly the evidence in question had probative bearing on the issue of punitive damages. In resolving that question the jury should take into consideration the attendant circumstances, both mitigating and aggravating, and the character and extent of the injury inflicted. Beggs v. Universal C.I.T. Credit Corporation, Mo.Sup., 409 S.W.2d 719; 25 C.J.S. Damages § 126(1), pp. 1163–1164.

Defendant finally complains that the trial court erred in submitting the issue of punitive damages to the jury, on the ground that "there was no express or implied malice shown". The complaint has no merit. Punitive damages may be awarded in a case of fraud and deceit where legal malice is present. In order

to establish that there was legal malice, it is sufficient to show that a wrongful act was intentionally done without just cause or excuse. It is not necessary to show that the particular act was attended by any spite or ill will or that it was wilfully or wantonly done. Universal C.I.T. Credit Corporation v. Tatro, Mo.App., 416 S.W.2d 696; Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W.2d 1083; Luikart v. Miller, Mo.Sup., 48 S.W.2d 867. There is abundant evidence in the record to support a jury finding of "legal malice" in the sense our courts have defined that term.

We have duly considered all authorities submitted by defendant but we find nothing therein to warrant conclusions other than those we have expressed.

Accordingly, we affirm the judgment.

All concur.