Wayne LOLLAR, d/b/a Lollar
Farms, Respondent,

v.

A.O. SMITH HARVESTORE
PRODUCTS, INC.,
Appellant.

No. WD 42537.

Missouri Court of Appeals,
Western District.

July 10, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 28, 1990.

Application to Transfer Denied
Oct. 16, 1990.

**442**

Donald E. Egan, Chicago, Ill., John C. Dods, Kansas City, David A. Domina, Omaha, Neb., for appellant.

Thomas J. Conway, Kansas City, John R. Elrod, Siloam Springs, Ark., James P. Valbracht, Chillicothe, for respondent.

Before TURNAGE, P.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

Appellant, A.O. Smith Harvestore Products, Inc. ("AOSHPI"), appeals the jury verdict rendered in favor of respondent, Wayne Lollar d/b/a Lollar Farms ("Lollar") for fraud in the amounts of $426,000 actual and $500,000 punitive damages. The alleged fraud occurred when appellant represented its feed storage equipment to be "oxygen-limiting," yet referred to its process as oxygen eliminating in its brochures and videotaped advertising upon which respondent relied. The respondent's petition was initially in three counts. However, both count I, breach of implied warranty, and count II, breach of express warranty, were directed out by the trial court; neither party appealed these directed verdicts. On appeal, the appellant contends that the trial court erred by: (1) failing to grant its motion for judgment notwithstanding the verdict ("JNOV") because defendant failed to prove the elements of fraud; (2) failing to grant its motion for JNOV as to punitive damages because there was no proof of outrageous conduct; (3) permitting respondent to use an improper damage instruction relative to compensatory damages; and (4) excluding testimony of satisfied users of the so-called "oxygen limiting" structures. We affirm.

Having been raised on a dairy farm and later developing his own dairy farming operation in the mid–50s, Wayne Lollar had been a dairy farmer throughout his life. Between 1957 and 1980, Lollar fed his dairy cattle feed from a pit silo. In 1959, Lollar was milking fourteen cows, and by the mid-to-late 1970s, he had 80 to 85 head of cattle. During this time period, Lollar packed his pit silos with silage to prevent spoilage, and fed his cattle from the pit silo, supplementing the feed with sixteen percent complete protein. In the mid–60s, Lollar averaged forty pounds of milk, per cow, per day; by the 1970s, he averaged up to fifty pounds of milk, per cow, per day. Lollar maintained herd health through regular visits by his veterinarian, who considered Lollar an above average farmer.

Lollar first heard of Harvestore structures in the mid–1970s. The Harvestore sales representatives, Finis Watt and Harry Dunn, visited Lollar once or twice a year, obtaining information regarding his dairy farm. At these visits, no films or literature were provided to Lollar.

In early 1981, the Harvestore salesmen returned. As part of the selling process, Lollar was taken on several "farm tours." Lollar visited both the Staiger and Parkhurst farms. Lollar listened to what the farmers said, but did not engage in any conversations with them. Watt and Dunn told Lollar that if he bought or leased a Harvestore structure, his milk production would increase, feed costs would decrease because there would be no need to supplement feed with protein, and that the structures would be labor-saving. Thus, the Harvestore structures would, in effect, pay for themselves.

The salesmen told him that the structures would "seal up like grandma's fruit jar." They demonstrated this process by dropping a match into a miniature Harvestore, closed it up, and the match went out. Lollar received several brochures about the Harvestore structures, published by AOSHPI. He also viewed at least two films provided by AOSHPI. In April of 1981, Lollar leased two Harvestore structures and purchased equipment necessary to begin operations.

Lollar put fescue, a grass silage, in one of the structures. This fescue was taken from another Harvestore structure. Watt located the fescue, and arranged for Lollar to purchase it. When he started feeding from this structure, his milk production went down. He contacted Watt and Dunn, who assured him that once he started feeding the oatlage, his milk production would increase; which it did. However, the increased production did not continue.

In the other structure, Lollar placed high moisture corn, sealed the structure in late October or early November, 1981, and let it set until December 8 or 9. Thereafter, on approximately February 9, 1982, the feed in both structures was tested, and Watt and Dunn told Lollar that he no longer needed to supplement the feed with sixteen percent protein. Lollar's milk production again dropped. He began experiencing problems with calf deaths. He noticed mold on the oatlage, and later on the sudex. Lollar also noticed mold on the high moisture corn. During this time, he was losing eighty percent of his calves.

He contacted his veterinarian, Dr. Clark Gwin, who was unable to solve the problem. He then contacted Dr. Krautman, whose assistance helped save some calves. Lollar described his cattle as being generally unthrifty during this time period. The cows had rough hair, dull eyes, and sores on their legs and bellies. Lollar continued to be concerned with his milk production. Again, he sought the advice of Watt. Watt recommended that beans and milo be fed to the cattle. Finally in April, 1984, Lollar began feeding sixteen percent protein in the barn, as he had done in the past. By October, 1984, Lollar quit using the structures altogether, and began feeding his cattle from his old pit silos, as well as supplementing the feed with sixteen percent protein.

Dr. Gwin testified that between 1980 and 1985 Lollar's cows were not in as good a physical condition as they had been in the past. He noticed that the cows' coats were rough, and that, generally, rough coats are indicative of parasite problems, disease problems, or nutritional problems. However, Dr. Gwin stated that he did not believe that Lollar's herd had suffered from any metabolic, viral disease or parasitic problems. Dr. Gwin did recall a lab report, indicating that twenty to twenty-five of Lollar's calves were affected by pneumonia in June, 1982. In October of 1985, Lollar, having experienced severe financial problems, had a dispersal sale of his livestock. He received mere slaughter value for his herd because of their poor health.

In 1983, Robert Zoyiopoulos, a licensed engineer, was invited to determine if the Harvestore structures were oxygen-limiting. As a part of this investigation, he reviewed a book published by AOSHPI called *The Winning System*. *The Winning System* defines "oxygen-limiting" as "a feed storage system in which the ensiled feeds are protected from access of oxygen." As part of his research, Zoyiopoulos also reviewed various patents and internal engineering and research reports prepared by AOSHPI. Additionally, he examined

over 200 Harvestore structures. The patents referred to the Harvestore structures as designed "to make an oxygen-free environment."

In Zoyiopoulos' opinion the Harvestore structures were not oxygen-limiting, but in fact oxygen-enhancing. He stated that in a conventional silo the top feed is always exposed to air, but, when you remove feed twice a day from the top, remaining feed is exposed to oxygen less than 12 hours per day. With respect to the Harvestore structure, it takes approximately two to two and one half days for the cutter arm of the unloader to make one complete revolution. Thus, the dome area is in constant contact with oxygen, saturating the feed. In Zoyiopoulos' opinion the problem was not with the Harvestore design, but rather with the concept.

At trial, Lawrence Scott, an animal nutritionist, described the fermentation process in feed, which takes about twenty-five to forty-eight hours for the feed to consume all the oxygen, and another seven to twenty-one days to completely ferment the feed. Reintroduction of oxygen to already fermented silage will only start the process all over again, resulting in oxidation. Oxidation is the process where oxygen molecules are added to carbohydrates and the protein, lowering the protein and energy availability to the animals consuming the feed. Scott described the process of oxidation as much like "grapes, the first fermentation you get wine, the second, you get vinegar, and the third time, you don't want to use it." Excessive amounts of oxygen reaching the silage mass binds the protein molecules. As more oxygen is introduced to the feed mass, heat will develop, and it is the temperature of the feed mass that binds the protein, producing mold growth. When heat-bound protein feed is fed to a cow, the animal will experience the following conditions: weight loss, drop in milk production, drop in reproductive performance, dull eyes, rough hair, and loss of appetite resulting in weight loss.

Dr. William G. Olson, a veterinarian and nutritionalist, explained that heat damage begins at ninety degrees Fahrenheit. He concurred with Scott on the effects of oxygen exposure to the feed. Upon reviewing Lollar's records as well as the feed samples, Dr. Olson's opinion was that there was heat damage to the feed, and that it was this damage that created poor quality feed, resulting in sickly performance by the herd. Dr. Olson did not agree that the Harvestore structures hold ensiled losses to a minimum, explaining that the Harvestore structures are not operated under the same conditions as the university studies indicate, because the farmer is continuously harvesting and feeding from the structure. Dr. Olson conceded that dull eyes, rough hair, and general unthriftiness can be caused by a variety of different causes, but he explained that the first cause he would focus on as a veterinarian and nutritionalist would be the energy-protein content of the feed.

## I.

While AOSHPI represented its Harvestore structures as "oxygen-limiting", it defined that term as "oxygen-free." By AOSHPI's own definition, "oxygen-limiting" meant that oxygen would not contact the feed; that any oxygen entering the structure would be contained in the breather bag. Consequently, molds would not grow and the nutritional value of the feed would remain high because oxidation is not possible. The Harvestore salesmen demonstrated this "oxygen-free" environment by dropping a match into a Harvestore model; they closed it up, and the match went out.

The primary question in a denial of a motion for JNOV is, "Did plaintiff make a submissible case?" *Norris v. Jones*, 687 S.W.2d 280, 281 (Mo.App.1985). In determining whether a submissible case has been made, the court must view the evidence and all reasonable inferences to be drawn therefrom, in the light most favorable to the prevailing party, and "must disregard the evidence to the extent that it does not aid [respondent's] case." *Id.* at 281; *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo.App.1980). A judgment notwithstanding the verdict is a drastic action and should be granted only when

reasonable men would not differ on the correct disposition of the case. *Marti v. Economy Fire & Cas. Co.*, 761 S.W.2d 254, 255 (Mo.App.1988).

The elements of fraud are:

1) a representation, 2) its falsity, 3) its materiality, 4) the speaker's knowledge of its falsity, or his ignorance of its truth, 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, 6) the hearer's ignorance of the falsity of the representation, 7) the hearer's reliance on the representation being true, 8) his right to rely thereon, and 9) the hearer's consequence and proximately-caused injury.

*Norden v. Friedman*, 756 S.W.2d 158, 164 (Mo. banc 1988).

■ AOSHPI, in its first point, alleges that its motion for JNOV should have been granted because Lollar failed to prove that the representation was false and known to be false by AOSHPI, or that the misrepresentation was relied upon or material to Lollar in making his decision to lease the Harvestores. AOSHPI argues that "oxygen-limiting technology reduces, but does not eliminate the access of air into the feed storage area." However, this is contrary to their sales promotion material.

In 1981, Lollar received several AOSHPI brochures and AOSHPI videos on the Harvestore structures. With respect to the sales representatives, Lollar testified:

(Direct examination by Mr. Elrod).

Q. What, if anything, did they tell you regarding oxygen in the Harvestore structure?

A. They told us that the Harvestore structure was oxygen-limiting, or oxygen-free.

Q. Did they tell you what that meant?

A. Yes, they said that whenever you put your feed in, and went up and closed the hatch on top, that it just sealed up like grandma's fruit jar.

\* \* \* \* \* \*

Q. Did they make—did they give you any demonstrations in your home that had anything to do with oxygen in the Harvestore structure?

A. Yes, they had a little miniature silo deal there that they lit a match and dropped the match in and closed it up. Naturally, the match went out.

Of the various pieces of literature provided to Lollar, as well as the videos shown to him, he identified two exhibits which he testified that he relied on at the time he leased the Harvestore structures. Regarding exhibits fifty and fifty-one, Lollar testified:

A. Well, the main thing I relied on that although microorganisms are still present, they cannot grow, molds cannot grow because they also need oxygen.

(By Mr. Elrod)

Q. Why was that important to you?

A. Because we was putting our silage in the pit silos and they said that's why [sic] she was getting most of our spoilage is through the elements, that being stored outdoors, and the oxygen in the elements.

\* \* \* \* \* \*

Q. All right, sir. Wayne, were you also showed a film prior to making your decision?

A. Yes, I was.

Q. How many films were you shown approximately?

A. Two, I think.

Q. Was there one in particular that you have recall about?

A. Yes.

Q. What in particular in this film caused you to be able to recall having seen it this many years later?

A. Well, what brought it out in my mind was two little cartoon characters in there, aerobic and anaerobic.

\* \* \* \* \* \*

Q. Did they tell you anything regarding the oxygen that got into the structures during the filling process, and what happened to it?

A. Yes, they told us that we should close the structure every night, even while we was filling, whenever we

went up and closed the top hatch on it, that within two to three hours, all the oxygen would be burnt up and used up in the fermentation state, and there would be no more oxygen, no more spoilage in it.

AOSHPI argues that the term "oxygen-limiting" was used only as a descriptive term relative to other feed storages. However, exhibit fifty, titled, *Why Is a Harvestore Called an 'Oxygen-limiting' Crop Processing System?*, states in part on the back page:

The Harvestore structure is as sealed a unit as can be practicably assembled and operated with present technology. After filling, a Harvestore structure is closed using the top hatch. *Any oxygen in the air is trapped in the structure at filling is quickly used up by the fermentations in the feed being processed.*

In fact, it should be completely utilized *three to four hours after the filler doors are shut.* In the fermentation process, plant and bacterial enzymes take the starches and convert them, in part, to sugar. Sugars, through bacterial action, are converted to acids and carbon dioxide. As the acidity increases enough, it brings to a halt the bacterial action. *The oxygen is used in the process.* Soon, there is a low PH and an *absence of harmful oxygen.* In a way, it is similar to a sterilization process, and the results in a canned product in which acids and the *lack of oxygen are used,* instead of heat, to "sterilize."

Although microorganisms are still present, they cannot grow. *Molds cannot grow,* because they also need oxygen. If oxygen-limited conditions are maintained, the crop can be stored for a long time.

The tightly closed, top-loading hatch and the bottom unloading system are *designed to exclude air.* And, plastic "breather bags" control the air which enters and leaves the structure ... thus avoiding unnecessary *contact by air with the crop.*

[emphasis added.] Exhibit fifty states that the Harvestore structures are designed to exclude air.

AOSHPI's sales film, exhibit fifty-one, also presented to Lollar during the selling process, contains the following statements:

The A.O. Smith engineers were faced with this problem of the need for the Harvestore to breathe, while at the same time keeping the *air from contacting the stored feed.* They solved this problem ... remember, the *air is contained in the bag so it doesn't come into contact with the feed* ... Well, what if you owned a Harvestore? The answer is that it would take the time element out of storage.

Exhibit fifty-one shows a cartoon scenario of the aerobic and anaerobic process of fermentation, which graphically portrays that any oxygen within the structure is quickly consumed, creating an oxygen-free environment. The film also demonstrates this process by showing a candle which is lit and a glass jar placed over it. Once the oxygen is consumed, the lighted candle is extinguished. This clearly represents to the customer that "oxygen-limiting," means an oxygen-free silo within two to four hours. At a minimum, AOSHPI's representation was that there would be insufficient oxygen in the silo for oxidation to occur.

AOSHPI argues that the language in the verdict director, instruction number six, did not ask the jury to determine if AOSHPI represented Harvestore structures to be oxygen-free, but required Lollar to prove that the Harvestore was not oxygen-limiting.

Instruction number six reads as follows:

### INSTRUCTION NO. 6

Your verdict must be for Plaintiff and against Defendant, A.O. Smith Harvestore Products, Inc., if you believe:

First, Defendant, A.O. Smith Harvestore Products, Inc., represented to Plaintiff through its sales materials that the Harvestore systems were oxygen limiting, intending that Plaintiff rely

upon such representation in leasing the Harvestore systems, and

Second, the representation was false, and

Third, Defendant, A.O. Smith Harvestore Products, Inc., knew that said representation was false, and

Fourth, the representation was material to the leasing by Plaintiff of the Harvestore systems, and

Fifth, Plaintiff relied upon the representation in executing the lease, and in so relying Plaintiff was using ordinary care, and

Sixth, as a direct result of such representation, the Plaintiff was damaged.

MAI 23.05 Submitted by Plaintiff

In instruction number six, Lollar used AOSHPI's term and its definition of its term. The evidence established, and the jury found, that AOSHPI intended that Lollar understand the meaning of "oxygen-limiting" to be that the Harvestore structures would be oxygen-free. While AOSHPI referred to "oxygen-limiting" in its advertisement, its representation to its customers is that oxygen will not contact the feed as occurred to Lollar.

■ AOSHPI next argues that Lollar failed to prove that AOSHPI knew the representations to be false. It claims that the internal engineering and research reports only show that AOSHPI's engineers knew that oxygen could and did enter the Harvestores. AOSHPI's internal engineering and research reports not only disclosed their awareness to oxygen entering the structure, but the continuing problems that existed by oxygen contamination to the feed.

The various internal research reports prepared by AOSHPI's engineers proved AOSHPI's knowledge that its representations as provided to Lollar were false, and that AOSHPI was fully aware of the severe consequences that existed from the oxygen contaminated ensiled feed. This combined with the clear intention of AOSHPI's brochures and video tapes, exhibits fifty and fifty-one, that the Harvestore structure eliminates oxygen after several hours, indicates that AOSHPI knew and intended for Lollar to rely upon false information.

Exhibits seventy-one, seventy-two, and seventy-three, internal engineering and research reports from AOSHPI, describe problems with the breather bag collapsing and air taken in when the unloader door is opened. Based on his experiences in investigating the Harvestore structures, Zoyiopoulos testified that the Harvestore structures were not oxygen-limiting as defined by them, but in fact the reverse; "it is 'oxygen-enhancing' ... because two million cubic feet of air ... come into the structure every year just because of the unloader."

Scott, the animal nutritionalist, testified that the reintroduction of oxygen after the feed is fermented will start the fermentation process again, causing bacterial growth and increased temperatures in the feed mass. Scott also testified that when mold grows on feed, it utilizes the most readily available nutrient, carbohydrates, to produce the mold growth. He stated that, if a certain kind of mold is developed, toxins can be produced that have a negative effect upon the cow's utilization, depressing the function of the cow's stomachs.

Scott also reviewed research reports from AOSHPI, which discuss the effects of both temperature and moisture during fermentation and mold growth, as well as maximum storage temperatures and the risk of heat damaged to the feed. Exhibit eighteen (a), NTD–7093, titled *Storage of Crop Studies*, was published December 23, 1980, just a few months before Lollar leased his Harvestore structures. The study verified the problems that the unloading process created during the feedout, causing a greater source of oxygen than the breather bags, resulting in oxygen exposure to the stored feed. Exhibit eighteen(a) at p. 2, stated as follows:

The experience of studying several structures in detail indicates that crop preservation performance could be improved by reducing oxygen input.

\* \* \* \* \* \*

The point is that it is going to require more than mathematical breathing models and lab studies on oxygen effects to define what is an acceptable oxygen input to Harvestore structures. We must also decide what level of performance is acceptable. If there are *too many complaints about moldy feed at the present, it is evidence that improved oxygen exclusion is needed.*

[Emphasis added].

■ Finally, AOSHPI argues that Lollar failed to prove that he relied on "the description that the Harvestore structures are oxygen-limiting, and that the description was material to his decision to lease" them. On cross-examination, Lollar testified that the main thing that stuck out in his mind was the back page of exhibit fifty. We decline to further restate Lollar's position, which is supported by the evidence, that he leased the Harvestore structures after relying on exhibits fifty and fifty-one, and the representations made by the Harvestore salesmen.

AOSHPI next contends that Lollar, by signing the lease for the Harvestore structures, "acknowledged that he was not relying on a brochure or similar promotion material in making his decision to lease the Harvestore structures." AOSHPI is apparently referring to exhibits fifty-two, fifty-three, fifty-four, the lease agreement signed by Lollar.

Exhibits fifty-three and fifty-four, the lease agreement signed by Lollar, contain on the backside of the agreement the "preamble" and "Acknowledgment and Reliance." The "Preamble" is found in the "Terms and Conditions" of the lease agreement, as paragraph 14. The "Acknowledgment and Reliance" clause is the final paragraph under that heading, some four paragraphs below the "Preamble."

AOSHPI suggests that this disclaimer found in the lease agreement, "specifically and expressly acknowledges non-reliance on certain representations." However, the "certain representations" argued by AOSHPI are not specified in the lease agreement. A review of exhibit fifty-three, indicates that the particular provisions in

question, are "nothing more than a printed 'boilerplate' recital obviously intended to be of general application [and] [a]s such, ... was wholly ineffective to immunize [Appellant] from liability for specific fraudulent representations." *Maples v. Charles Burt Realtor, Inc.,* 690 S.W.2d 202, 213 (Mo. App.1985). *See also Agristor Leasing v. A.O. Smith Harvestore Products,* 869 F.2d 264, 268 (6th Cir.1989).

Unlike the disclaimer found in *Luli Corp. v. El Chico Ranch, Inc.,* 481 S.W.2d 246, 256 (Mo.1972) cited by AOSHPI, wherein the court found that disclaimer to be "positive, direct, and to the point, even of disclosing the source of the questioned representation," the disclaimer found in exhibit fifty-three in this case is purely "boilerplate."

■ Missouri law similarly holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract. *Maples v. Charles Burt Realtor,* 690 S.W.2d at 212.

■ AOSHPI next claims that Lollar's "reliance on AOSHPI's statements modified the express language contained in the purchase orders, and therefore, is barred by the parol evidence rule;" that, under this rule, Lollar should not have been allowed to vary, add or subtract from the terms of the original agreement.

Missouri law has consistently held:

The rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties *does not* apply to fraudulent representations made for the purpose of inducing a party to enter into such contract.

[Emphasis added]. *Horowitz v. Schaper,* 119 S.W.2d 474, 481 (Mo.App.1938); *e.g., Beshears v. S–H–S Motor Sales Crop.,* 433 S.W.2d 66, 71 (Mo.App.1968). Parol evidence is admissible in fraud cases. Respondent's claim is clearly in fraud, not in contract. Thus, a purchaser, or in this case a lessee, who has been defrauded, "may establish fraudulent representations which rest in parol by parol [evidence] as the fraud is not merged into the written con-

tact." *Rogers v. Hickerson,* 716 S.W.2d 439, 446 (Mo.App.1986) (citations omitted). For the aforesaid reasons, we find appellant's arguments to be without merit.

## II.

■ In order to sustain a case for punitive damages, Lollar is required to prove that AOSHPI's description of its Harvestore structures as oxygen-limiting technology is outrageous. It is not the mere description of the Harvestore structures as oxygen-limiting that is "outrageous," but it is AOSHPI's conduct in continuing to make such representation, knowing they are false.

In *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989), the Missouri Supreme Court, in setting out its new punitive damage instruction, relied upon § 908(2) of Restatement (Second) of Torts (1979) as properly setting out "the law in *language readily understandable* by lawyers and lay people alike." *Id.* at 789. [Emphasis added]. That language is:

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or *reckless indifference* of the rights of others.

[Emphasis added].

The internal documents of AOSHPI showed that AOSHPI knew for many years the existence of problems of oxygen intrusion into the Harvestore structures and the resulting problems oxygen caused on the stored feed. At no time during the sales process, or after Lollar leased the Harvestore structures and began experiencing problems with his cattle and spoiled feed, did AOSHPI ever come forward and explain or disclose to Lollar the problems with oxygen contamination in the Harvestore structures. "Silence or non-disclosure of a material fact, when used as an inducement to another, can be an act of fraud." *Miller v. Higgins,* 452 S.W.2d 121, 124 (Mo.1970).

Lollar leased the Harvestore structures on April 14, 1981. Exhibit eighteen, NTD–7093, titled *Storage of Crop Studies,* was dated December 23, 1980. Just a few months before Lollar decided to lease the

Harvestore structures, AOSHPI was obviously aware that the unloading system allowed oxygen, which produced mold, to enter the structure through the unloading system during feedouts.

The internal research reports introduced by Lollar did not merely demonstrate a desire on AOSHPI's part to improve its product, but were studies conducted to show that the Harvestore structure did not perform as claimed. The reports further showed that oxygen entering the structure after the fermentation process began created increased temperatures within the structure due to oxidation and caused heat-bound protein, thereby destroying the protein and energy availability to the cows consuming the feed.

AOSHPI's representations to Lollar were contrary to its internal research reports. Thus, AOSHPI's conduct was outrageous, and showed a reckless indifference to the rights of others.

■ Next, appellant challenges Missouri's punitive damage instruction. The punitive damage instruction submitted to the jury, instruction number ten, reads as follows:

### INSTRUCTION NO. 10

If you find the issues in favor of plaintiff, and if you believe the conduct of defendant A.O. Smith Harvestore Products, Inc., as submitted in Instruction Number 6, was outrageous because of defendant A.O. Smith Harvestore Products, Inc.'s evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number 9, you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish A.O. Smith Harvestore Products, Inc. and to deter it and others from like conduct.

■ "Once a patterned instruction has been adopted by the Missouri Supreme Court, the appellate courts are powerless to declare the instruction erroneous." *State v. Turner,* 705 S.W.2d 108, 110 (Mo.

App.1986). An instruction that exactly follows the format of an approved instruction is proper. *See State v. Gunter*, 715 S.W.2d 576, 578–79 (Mo.App.1986).

AOSHPI argues that an award of punitive damages can be effectively reviewed for *excessiveness*, since it must bear a rational relationship to its compensatory purpose. The United States Supreme Court in *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, —— U.S. ——, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), addressed the issue of excessiveness of a punitive damage award, holding that it was not a violation of the eighth amendment, and that the eighth amendment does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of damages awarded. *Id.* at ——, 109 S.Ct. at 2918. In so ruling the Supreme Court acknowledged that awards of double or treble damages authorized by statute date back to the 13th century. *Id.* at ——, 109 S.Ct. at 2919.

If AOSHPI's argument that instruction number nine, pursuant to MAI 10.01, is unconstitutional, this Court has no authority to declare it erroneous because it has been adopted by the Missouri Supreme Court. If, on the other hand, AOSHPI's argument is that the damages award is excessive in violation of the due process clause, by failing to allege that this award is based on bias or passion or that the proceedings lacked fundamental fairness as required under *Browning–Ferris*, AOSHPI's claim is not preserved in accordance with Missouri Supreme Court Rule 84.04(d).

### III.

■ AOSHPI attacks the trial court's submission of instruction number nine, pursuant to MAI 4.01, but does not set the reasons fully forth in its argument. Further, although AOSHPI claims an instruction was mandated by MAI 4.03, it did not proffer an instruction. Finally, AOSHPI argues that instruction number nine submitted to the jury should have been modified. Again, no modified instruction was proffered to the trial court.

Instruction number nine reads as follows:

### INSTRUCTION NO. 9

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained, as a direct result of the occurrence mentioned in the evidence.

AOSHPI argues that the trial court should have instructed the jury pursuant to MAI 4.03 because Lollar did not rescind his contract, and that "when a victim chooses not to rescind his contract, which he claims was induced by fraud, but chooses instead to claim the warranty benefits of that contract, his damages for fraud are limited to the benefit of the bargain." Citing to the instruction, AOSHPI argues that MAI 4.03 is proper because it would have allowed the jury to award "the difference between the actual value of the [Harvestore structure] on the date it was *sold* to plaintiff and what its value would have been on the date had [the Harvestore structure] been as represented by defendant."

Lollar did not purchase nor did AOSHPI sell to Lollar the Harvestore structures. There was *no contract between Lollar and AOSHPI*. Therefore, rescission cannot take place. Lollar did not own but leased the Harvestore structures from Agristor Leasing. Agristor Leasing removed the Harvestore structures from Lollar's farm, pursuant to the lease agreement because Lollar defaulted on his lease.

The trial court properly submitted instruction number nine to the jury, pursuant to MAI 4.01 because, as the Notes on Use under MAI 4.03 specifically point out: "[w]here plaintiff has evidence of other damages (such as personal injury suffered because the property was not as represented), MAI 4.01 should be used." Further, MAI 4.03 uses language requiring evidence of a sale of merchandise. No sale existed in this case.

Missouri law has also consistently held that the "benefit-of-the-bargain rule" does not apply where:

[t]he purchaser rescinds and returns the property received *or* where he received *nothing of value*, and in such case he may properly recover the amount he paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations.

[Emphasis added]. *Salmon v. Brookshire*, 301 S.W.2d 48, 54 (Mo.App.1957), *citing*, *Schroeder v. Zykan*, 255 S.W.2d 105, 110 (Mo.App.1953).

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441 (Mo. banc 1988) involved a lessee who claimed misrepresentation against the defendant. In *Heberer*, the misrepresentation claimed was on the basis that the lessee would be given the right to operate a new service station if he would extend the current three-year lease on his old station. The new station was opened and Heberer did not get it. The Missouri Supreme Court stated that:

Benefit of the bargain damages as defined above do not flow naturally from this alleged misrepresentation. Appellant received nothing of value in return for his agreement to extend the lease. The benefit of the bargain rule does not apply where the purchaser rescinds and returns the property received or where he received nothing of value.... In such case, he may properly recover the amount he paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations.

*Id.* at 443. (citations omitted).

■ AOSHPI next argues that Lollar not only received the benefit of his bargain, but also received a double recovery, because instruction number nine allowed Lollar to "recover the difference between the value of the Harvestore structures as promised and the value he actually received and such special damages he could prove." AOSHPI argues that Lollar received far more than the benefit of the bargain because he was able to recover the total amount of lease payments, as well as request special damages. However, Lollar, by leasing the Harvestore structures, *received nothing of value*, and, as such, is

permitted to recover the amount he paid, plus incidental losses and expenses suffered as a result of the misrepresentations. *Salmon v. Brookshire*, 301 S.W.2d at 54; *see also B.L. Jet Sales, Inc. v. Alton Packaging Corp.*, 724 S.W.2d 669, 673 (Mo.App. 1987) (reliance damages in a misrepresentation case permitted).

■ AOSHPI next claims that even if MAI 4.01 was appropriate, it was prejudicial error to give the instruction without modification. AOSHPI argues that pursuant to Notes on Use to MAI 4.01, the term "occurrence" found in the instruction should have been modified to specifically refer to the description that Harvestore structures are oxygen-limiting, since the jury may have been misled by the evidence of other miscompensable occurrences that affected Lollar and his farming operation.

AOSHPI neither objected to the form of instruction number nine nor did it tender a proposed modified instruction. *See State ex rel. Kansas City Power and Light Co. v. Campbell*, 433 S.W.2d 606, 612 (Mo.App. 1968) (party could not be heard to complain on appeal that instruction was incomplete or insufficient where party failed to offer clarifying or amplifying instruction). Therefore, this issue on appeal has not been properly preserved.

In *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984), the same argument was made by the appellant that MAI 4.01 without change was improper because it included the language, "as a direct result of the occurrence mentioned in the evidence." *Id.* at 71. The court stated:

Had the defendant really considered that there was substantial prejudice in the instruction, so that he would be less able to present his contentions to the jury, he could have pointed out the problem highlighted by Note on Use No. 3 to MAI 4.01 and could have requested a clarification, or could have submitted his own instruction containing the modification he considered appropriate.... *If a defect is not readily apparent to alert counsel preparing to argue the case, there is very little likelihood that the jury will be confused or misled.* Counsel should

think twice before simply putting perceived deviations from MAI or the Notes on Use into the error bag, instead of asking for a more satisfactory instruction.

*Id.* at 71–72. Such is the case here. The only theory submitted in respondent's verdict directing instruction is the false representation of what "oxygen-limiting" meant. It was the only "occurrence."

Cases cited by AOSHPI in support of its position that the submission of unmodified instruction number nine was reversible error are clearly distinguishable: *Thweatt v. Haefner,* 539 S.W.2d 734, 735 (Mo.App. 1976) (plaintiff was in an automobile accident and thereafter suffered three separate falls, bursitis in the neck and shoulder, and at the trial was complaining of all of these injuries); *Vest v. City Natl. Bank & Trust Co.,* 470 S.W.2d 518, 521 (Mo.1971) (plaintiff fell 25 feet from a roof and suffered multiple injuries; plaintiff's instruction failed to modify MAI 4.01 to include the serious injuries sustained by the plaintiff for which the treating doctors were not responsible in the malpractice action filed against the defendant doctors); *Homm v. Oakes,* 453 S.W.2d 679, 681–82 (Mo.App. 1970) (MAI 4.01 held improper without modification where the plaintiff suffered personal injuries in an automobile accident in May and received further similar injuries in June; she also complained of similar injuries as a result of a fall before the two automobile accidents); *Jurgeson v. Romine,* 442 S.W.2d 176, 178 (Mo.App.1969) (two separate occurrences: unusual rains and flooding, and the blocking of a stream by the erection of a dam).

Only one occurrence existed in this case; the fraud that induced Lollar to sign the lease. The fact that the fraudulent representations were presented to Lollar in at least two means does not result in separate occurrences for one fraud. No evidence existed that Lollar's damages were caused by any occurrence other than AOSHPI's fraud. For the aforesaid reasons, appellant loses on these points.

## IV.

■ Lollar filed a motion in limine to exclude evidence of satisfied farmers. The trial court entered an order sustaining Lollar's motion. However, the court permitted AOSHPI to introduce testimony of any of the farmers "who served as tour stops for [AOSPHI]." AOSHPI contends that "satisfied users" testimony is relevant to rebut Lollar's experts' testimony that "the Harvestore concept is a bad one, and that Harvestore structures do not work." Lollar's experts gave their opinions based on AOSHPI's internal engineering and research reports.

AOSHPI was permitted and did offer evidence of at least two "satisfied users;" Staiger, whose farm was one of which Lollar visited, and Chamberlain. AOSHPI suggests that "satisfied user" evidence should be admitted because in a product design defect case, if the design is, in fact, 'defective' then all units have the same defect. AOSHPI cites to *Russell v. Midwestern Homes & Truss, Inc.,* 514 S.W.2d 651 (Mo.App.1974). In *Russell,* the plaintiff was permitted to introduce evidence that the plans were successfully used in other structures, but that the trusses purchased from defendants were defective. *Id.* at 652. AOSHPI omits the fact that the plaintiff in *Russell* presented *expert* testimony on that issue. *Id.* at 651.

AOSHPI argues that product design was an issue in Lollar's case. Lollar's case was in fraud, not products liability. Even if the issue of product design was injected into this case, AOSHPI failed to offer any expert testimony via its engineers, to rebut this contention, allowing the jury to draw any negative inference thereby.

The case of *McJunkins v. Windham Power Lifts, Inc.,* 767 S.W.2d 95 (Mo.App. 1989), also cited by AOSHPI, held that proof of the absence of other accidents involving the product is relevant. *Id.* at 100. However, the court ruled that it was prejudicial error to improperly raise a collateral issue that may mislead or confuse the jury, stating:

Admitting evidence of the absence of other accidents without such a foundation

[evidence of substantially similar conditions and an adequate number of those situations] could present evidence to a jury that was irrelevant to the case before it. Whether the foundation is adequately shown is primarily within the discretion of the trial court. This holding is consistent with the results reached in previous Missouri cases. As the foundation was not established before the evidence here was admitted, the evidence of the absence of prior accidents was not admissible.

*Id.* In the case at bar, the trial court properly exercised its discretion in excluding the evidence of satisfied users.

When the court sustained Lollar's motion in limine to exclude evidence of "satisfied users," he stated;

> However, the court may alter this ruling subject to the evidence presented at trial. Harvestore farmers who served as tour stops for Mr. Lollar will not be precluded from testifying.

At the trial, no effort was made by AOSH-PI to make an offer of proof, giving the names and the testimony of satisfied customers. Missouri courts have been unanimous in holding that in order to convict a trial court of error for excluding evidence, there must be a proper and complete offer of proof as to what the party offering the evidence is expecting to prove by the witness:

> It has long been the rule in this state that the proper procedure to present and preserve such a offer is to have the witnesses present; put them on the stand; propound the questions; and thus enable the trial court to intelligently rule upon, and an appellate court to review, the propriety and admissibility of the evidence sought to be elicited.

*State v. Sullivan*, 553 S.W.2d 510, 513 (Mo.App.1977). *See also, Kinzel v. West Park Investment Corp.*, 330 S.W.2d 792, 795–96 (Mo.1959); *Tamper v. Schaper*, 748 S.W.2d 183, 184 (Mo.App.1988); *Hawkinson Tread Tire Service Co. v. Walker*, 715 S.W.2d 335, 336 (Mo.App.1986).

In *Luthy v. Denny's, Inc.*, 782 S.W.2d 661 (Mo.App.1989), the defense attempted to introduce evidence of the absence of prior accidents. *Id.* at 665. This Court upheld the trial court's broad discretion in excluding this type of testimony if there was no evidence laying a foundation for the fact that prior accidents had not occurred, and the evidence raised a collateral issue that may have confused or misled the jury. *Id.* at 666–667. For the aforesaid reasons, the appellant loses on this point.

The judgment of the trial court is affirmed.

All concur.